### MRS. E. J. COLLIER v. J. R. COUTS.

No. 699. Decided November 3, 1898.

#### 1. Limitation—Suspension of Statute—Interruption of Possession.

The constitutional and statutory provisions suspending the operation of statutes of limitation between 1861 and 1870 were intended for the relief of those against whom the limitation might be pleaded, and not for the benefit of those pleading the statute; they do not require that period to be treated as if it had never existed, and possession abandoned during a part of that time to be considered continuous. Rev. Stats., arts. 3343, 3348, 3366; Pasch. Dig., arts. 4630, 4631, 4631a; Const., 1869, art. 12, sec. 43. (Pp. 237, 238.)

#### 2. Same—Case Stated.

Plaintiff was born in 1834, inherited land in 1842, and was a married woman from 1859 to 1893; possession under adverse claim commenced in 1857, continued till abandoned in 1862, was resumed in 1868, and then continued till 1879. Held, that the

limitation set running by the possession before plaintiff's disability, was interrupted by its abandonment, and on the resumption of possession in 1868 the statute did not run against plaintiff, by reason of her disability. (Pp. 235, 239.)

ERROR to the Court of Civil Appeals for the Second District, in an appeal from Parker County.

Mrs. Collier sued Couts for recovery of land and was defeated on his plea of ten years limitation. The judgment being affirmed upon her appeal, she obtained writ of error.

*Alexander & Fain* and *W. S. Essex*, for plaintiff in error.—A break in the possession of the land by the defendant, or those under whom he claims, occurring in 1862, should be given the same effect, when considered with reference to the defendant's title by limitation, as if that break had occurred prior to January 28, 1861. Ragsdale v. Barnes, 68 Texas, 504.

The suspension of the statute by the Constitution of 1869 was intended for the benefit of persons who might otherwise lose their land by adverse occupancy while the courts were closed, and was not intended for the benefit of persons claiming land by limitation. Grigsby v. Peak, 57 Texas, 142; Campbell v. Holt, 115 U. S., 620; Shriver v. Shriver, 86 N. Y., 575; Tied. on Real Prop., secs. 693, 704.

*Harry W. Kuteman*, for defendant in error.—The court did not err in charging the jury that if Barker held adverse possession of the land prior to January 28, 1861, and defendant held continuous adverse possession on and after the 30th day of March, 1870, and said defendant remained in peaceable, adverse, and continuous possession from said date, and the period of defendant's adverse possession added to the period of Barker's adverse possession made ten years of adverse, peaceable possession in Barker and Couts, then they should find for the defendant. Const. 1869, art. 12, sec. 43; French v. Strumberg, 52 Texas, 110.

GAINES, CHIEF JUSTICE.—We take the following statement of this case, together with the conclusions of fact of the Court of Civil Appeals, from the opinion of that court:

"On June 27, 1894, the appellant brought this suit in trespass to try title to recover from J. R. Couts, appellee, an undivided interest of 11-24 of the Azariah Brackene 290 acres survey, adjoining the city of Weatherford, Parker County. The plaintiff is a daughter of Azariah Brackene, to whose heirs the land was patented. She was born on July 12, 1834, her father dying in March, 1842. The trial judge held her entitled to recover unless defeated by the defendant's plea of the ten year statute of limitation, upon which alone the appellee prevailed. Among other matters, the plaintiff seeks to avoid the defense of limitation on the ground of coverture. It appears that she married B. B. Collier on April

14, 1859, and that this marriage terminated with his death on March 5, 1893. In connection with his plea, the defendant offered the following instruments: (1) A certified copy of the unconditional headright certificate to A. Brackene, dated November 21, 1848, to 640 acres of land. (2) A transfer by W. T. J. Brackene to John McMillan, dated November 16, 1849, transferring 290 acres of this certificate. The transfer itself purports to be the act of William T. J. Brackene, but the certificate of acknowledgment describes William Brackene as the grantor and as acting in the capacity of administrator of the estate of A. Brackene, deceased. (3) A certified copy of a transfer dated December 16, 1854, from John McMillan to Jesse R. Wright, of 290 acres of the land called for by the unconditional certificate. (4) A transfer of the certificate from Jesse R. Wright to John Matlock, dated December 8, 1855, and a certified copy of the transfer of the same certificate from John Matlock to Joshua Barker, dated December 11, 1857. (5) A certified copy of the field notes of the survey of 290 acres of land, made for the heirs of A. Brackene by Llewellyn Murphy, surveyor of Parker County, describing the survey in controversy, dated December 21, 1852, and filed in the General Land Office July 26, 1858. (6) The original patent, dated December 22, 1860, from the State to the heirs of A. Brackene, to the land in controversy. With this claim of Joshua Barker the defendant connects himself by a deed from the sheriff of Parker County, dated April 8th, and duly recorded April 9, 1868, resting upon an execution levied upon the land in controversy on March 18, 1868, which issued upon a valid judgment in favor of one A. C. Crane against Joshua Barker; it appearing that the appellee became the purchaser at the sheriff's sale had by virtue of this levy and execution.

"With reference to the character and the extent of the possession relied upon by the appellee in support of his defense of ten years' limitation, the evidence justifies the following conclusions of fact, imported by the verdict of the jury under the charge of the court: Joshua Barker built a house upon the survey, in which he lived continuously from 1857 or 1858 until 1862. This occupancy by him seems to have been under his claim to the entire survey, except as to a tract of about four acres owned or claimed by one A. J. Ball from about 1859, inferentially in privity with Barker. West of this Ball tract was a field of some 15 acres controlled by Barker. From 1862 until April 8, 1868, when Couts purchased, the property was vacant. As soon as Couts purchased it, in 1868, he claimed the entire tract, less, perhaps, the small quantity held by Ball. Couts did not himself live upon the land, but his tenant occupied a house which was within the 15-acre field from the date of Couts' purchase until about the year 1879, when it seems that the property was divided into town lots. This tenancy, as indicated, began immediately upon the purchase by Couts, and the field, though perhaps not cultivated during the first year of the occupancy, was cultivated from about 1870 until 1879, during which time, as also above indicated, Couts claimed the land outside of the 15-acre field."

Article 3343 of the Revised Statutes provides, that "any person who has the right of action for the recovery of any lands, tenements, or hereditaments against another having peaceable and adverse possession thereof, cultivating, using, or enjoying the same, shall institute his suit therefor within ten years next after his cause of action shall have accrued, and not afterward." Article 3348 defines peaceable possession as being "such as is continuous and not interrupted by adverse suit to recover the estate." When the possession has not been continuous, that is, when there has been a break in the occupancy, the possession preceding the break does not in any manner affect the title. Since the plaintiff in error had attained her majority and was unmarried at the time Joshua Barker took possession, an unbroken possession by him and those claiming in privity with him for the statutory period would have defeated her title. On the other hand, since the first possession was abandoned and she was a married woman at the time the land was again adversely occupied and held, it is clear that limitation would not have begun to run against her until the death of her husband in 1893, unless the laws which suspended the operation of the statute of limitations during the time the possession was abandoned had the effect to make the two possessions in legal contemplation continuous. The trial court and the Court of Civil Appeals both held that such was the operation of these laws. In so holding, we think they were in error. Doubtless the law-making power, under certain limitations, might have provided that a possession in fact abandoned during the continuance of the war or until a certain time after its termination should be deemed continuous for the purposes of the statute of limitations. In other words, it might have provided that the statute should continue to run notwithsanding a break in the possession occurring during the designated period. But in our opinion it was the purpose neither of the legislatures nor of the constitutional conventions which made the several provisions for suspending the operation of the statute of limitations during the war to give to such provisions so wide a scope. The first act was passed in 1862, and related only to contracts for the payment of money. Pasch. Dig., art. 4630. But a more comprehensive provision was enacted in 1863. In so far as it affects the question under consideration, it reads as follows: "All statutes of limitations on all civil rights of action of every kind, whether real or personal, are hereby suspended until one year after the close of the war between the Confederate States and the United States." \* \* \* Pasch. Dig., art. 4631. The constitutional convention of 1866 passed an ordinance in the following words: "In all civil actions, the time between the 2d day of March, 1861, and the 2d day of September, 1866, shall not be computed in the application of any statute of limitations." Pasch. Dig., art. 4631a. Section 43 of article 12 of the Constitution of 1869 reads as follows: "The statutes of limitation of civil suits were suspended by the so-called Act of Secession of the 28th of January, 1861, and shall be considered as suspended within this State, until the acceptance of this Constitution by the United States Congress." The follow-

ing is the provision of the Revised Statutes upon the same subject: "The laws of limitation of civil suits in this State shall be considered as suspended during the late civil war, commencing on the 28th day of January, 1861, and ending on the 30th day of March, 1870; but nothing herein shall be held to revive any cause of action heretofore barred." All the provisions quoted, as we think, have in view substantially the same end. The purpose is perhaps more clearly expressed in the ordinance of the convention of 1866, which provides that the designated time "shall not be computed in the application of any statute of limitations." All the other provisions declare that the statute shall be "suspended." A provision declaring that a certain time shall not be computed in effect suspends the statute for that time. So also a provision which declares the statute shall be suspended for a certain period is equivalent to saying that it shall not be computed for that period. Ragsdale v. Barnes, 68 Texas, 504, presented a question analogous to that under consideration. The appellant in that case was an infant before and during the time the statute was suspended by the Constitution of 1869, but married during that period, after adverse possession had been taken. To avoid the plea of limitation, it was contended that because the statute was suspended at the time of her marriage, the marriage did not set the statute in operation against her. In disposing of the question, the court says: "The object of the provision of the Constitution of 1869 was merely to prevent the suspended period from being taken into account in the computation of the time required by the statute to bar an action, and was not to restore a disability that had already been removed." It seems to us that the contention in that case, as in this, is based upon the theory that the effect of a provision suspending a statute of limitation is, for the purposes of the law of limitation, to obliterate the period of suspension, and that, in applying the statute, such period should be treated as if it had never existed. We held against the contention in that case, and must so hold in this. The provisions in question were intended for the relief of those against whom limitation might be pleaded, and not for the benefit of those who might plead the statute.

The question came before the Supreme Court of North Carolina in the case of Malloy v. Bruden, 86 North Carolina, 251, and it was held that the two possessions could not be tacked. In their opinion the court say: "It is not denied that the actual possession of the guardian, after having continued from 1857 to 1863, was then interrupted and abandoned during the years 1864-65,—no one occupying the land, throughout the whole of those two years, in any way that could possibly put the owner to bringing a possessory action for it; and according to all the authorities this hiatus occurring in the actual occupation of the land, put a stop to the statute then running against the owner. Ang. on Lim., 413; Holdfast v. Shepard, 6 Ired., 361. At all times there is a presumption in favor of the true owner, and he is deemed by law to have possession coextensive with his title, unless actually ousted by the personal occupation of another; and so, too, whenever that occupation by another

ceases, the title again draws to it the possession, and the seizin of the owner is restored; and a subsequent entry, even by the same wrongdoer and under the same claim of title, constitutes a new disseizin, from the date of which the statute takes a fresh start. The fact that such an interruption occurred during the interval between 1861 and 1870, when the statute of limitations was suspended, can not affect the case. In contemplation of law, it was a fact accomplished that in 1864-65 the owner made entry upon the land, and thereby destroyed the effect of all prior adverse possession; and as a thing done, it must be attended with all the consequences as if done at any other time. We take it that it would hardly be disputed that the acknowledgment of a debt as still subsisting, made in 1865 by a bond debtor, could be given in evidence against him in an action brought upon the bond in 1870, and thereby repel the presumption of payment, and if so, why not the fact that, by entry, the owner of land had broken that continuity of possession upon which the bar of the statute depended?"

The determination of the previous question also determines the question of the admissibility of the sheriff's deed, which purported to convey the land in controversy as the property of Joshua Barker to the defendant in error. Since Barker was out of possession when that sale was made and his prior possession can not be tacked to the possession of Couts, evidence of the sale was wholly immaterial. It should have been excluded.

For the error in holding that the possession of defendant in error could be tacked to that of Barker, the judgment of the Court of Civil Appeals and that of the District Court are reversed and the cause remanded.

*Reversed and remanded.*